**James K. EDGAR and Mary K. Edgar, on behalf of Jamie K. Edgar, their daughter, Petitioners–Appellants,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent–Appellee.**

No. 92–5130.

United States Court of Appeals, Federal Circuit.

March 11, 1993.

Rehearing Denied May 25, 1993.

474

Patrick J. Gilmartin, Gilmartin, Poster & Shafto, New York City, argued, for petitioners-appellants.

Caroline G. Elmendorf, Torts Branch, Dept. of Justice, Washington, DC, argued, for respondent-appellee. Stuart M. Gerson, Asst. Atty. Gen., Helen M. Goldberg and David L. Terzian, Dept. of Justice, Washington, DC, were on the brief, for respondent-appellee.

Before NEWMAN, Circuit Judge, SMITH, Senior Circuit Judge, and ARCHER, Circuit Judge.

ARCHER, Circuit Judge.

James K. Edgar and Mary K. Edgar (Edgar), on behalf of their daughter Jamie K. Edgar (Jamie), appeal from the judgment in the United States Claims Court[1] (No. 90–711 V, filed April 28, 1992) affirming the special master's decision (No. 90–711 V, filed October 24, 1991) in favor of the Secretary of the Department of Health and Human Services (Secretary) under the National Vaccine Injury Compensation Program. 26 Cl.Ct. 286. We vacate and remand.

## DISCUSSION

### I.

Jamie K. Edgar was born on May 25, 1984. She received diphtheria-pertussis-tetanus (DPT) vaccinations on July 26, October 26, and December 6, 1984. She then received a DPT booster vaccination and an oral polio vaccination on June 27, 1989. Today, Jamie is in a coma and depends entirely on hospital staff for her continued care and well-being.

James K. Edgar and Mary K. Edgar filed on behalf of their daughter Jamie for compensation under the National Childhood Vaccine Injury Act, Pub.L. No. 99–660, § 311(a), 100 Stat. 3758 (1986) (codified as amended at 42 U.S.C.A. §§ 300aa–10 through 300aa–34 (West 1991 & Supp. 1992)) (Vaccine Act). The Secretary conceded that Edgar was entitled to compensation under the Vaccine Act and the matter proceeded to a special master for a determination of appropriate compensation. The Claims Court affirmed the special master's decision, which granted Edgar $277,048.00 in compensation, consisting of $100,000.00 for past pain and suffering, $50,000.00 for future pain and suffering, and $127,048.00 for lost earnings (42 U.S.C.A. § 300aa–15(a)(3)(B) (West 1991) provides for compensation for "impaired earning capacity," which is usually referred to as lost earnings).

Applying the statutory standards, the special master found that Jamie's lost earnings due to her impairment aggregated $1,649,119.51 over her expected work-life. Neither party contests this finding on appeal. Each party submitted calculations based on a discount rate of 7.04 percent to arrive at the net present value of those lost earnings. Edgar calculated the net present value of $1,649,119.51 to be $282,234.00, and the Secretary calculated it to be $254,886.35. The two calculations differ because each party used slightly different assumptions, *e.g.,* applicable taxes, life expectancy, etc.

After the parties had submitted their calculations and shortly before the decision was rendered, the Secretary supplied the special master with an insurance company quotation of $127,048.00 as the cost of purchasing a deferred life-contingent annuity. This annuity quotation was premised, *inter alia,* upon two conditions: (1) no payments would be made if Jamie died before reaching age 18; and (2) the deferred payments would cease on Jamie's death even though $1,649,119.51 had not yet been paid. Instead of awarding Edgar either $254,886.35 or $282,234.00 as the parties had first calculated, the special master awarded Edgar $127,048.00 as the lump-sum compensation for lost earnings.

On appeal, Edgar challenges only the $127,048.00 award for lost earnings.

### II.

A. The issue in this case is whether the Claims Court erred in sustaining the special master's decision that the net present value of impaired earning capacity under 42 U.S.C.A. § 300aa–15(a)(3)(B) (West 1991) may be determined by the cost of a deferred annuity, where the cost of the annuity reflects contingency factors under which the aggregate lost earnings might not have to be paid in full. We review *de novo* the Claims Court's determination as to whether the special master's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Hines v. Secretary*

---

1. The Claims Court was renamed the Court of Federal Claims on October 29, 1992. Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506.

*of the Dep't of Health & Human Servs.,* 940 F.2d 1518, 1524 (Fed.Cir.1991); *see also Munn v. Secretary of the Dep't of Health & Human Servs.,* 970 F.2d 863 (Fed.Cir. 1992).

B. The Secretary has conceded that Edgar is entitled to compensation under the Vaccine Act. The Vaccine Act prescribes the types of compensation that shall be awarded and includes lost earnings as one type of compensation. *See* 42 U.S.C.A. § 300aa–15(a) (1988). The Vaccine Act further specifies how the amount of compensation for lost earnings shall be calculated:

(a) General rule

Compensation awarded ... shall include the following:

.     .     .     .     .

(3)(B) In the case of any person who has sustained a vaccine-related injury before attaining the age of 18 and whose earning capacity is or has been impaired by reason of such person's vaccine-related injury for which compensation is to be awarded and whose vaccine-related injury is of sufficient severity to permit reasonable anticipation that such person is likely to suffer impaired earning capacity at age 18 and beyond, *compensation after attaining the age of 18 for loss of earnings* determined on the basis of the average gross weekly earnings of workers in the private, non-farm sector, less appropriate taxes and the average cost of a health insurance policy, as determined by the Secretary.

42 U.S.C.A. § 300aa–15(a)(3)(B) (West 1991) (emphasis added).

The Vaccine Act thereafter sets forth the method of payment of the amount calculated under section 15(a)(3)(B) as follows:

(4)(A) Except as provided in subparagraph (B) [for retrospective cases], *payment* of compensation under the Program *shall be determined on the basis of the net present value of the elements of the compensation and shall be paid from the Vaccine Injury Compensation Trust Fund ... in a lump-sum* of which all or a portion of the proceeds may be used as ordered by the special master to purchase an annuity or otherwise be used, with the consent of the petitioner, in a manner determined by the special master to be in the best interests of the petitioner.

42 U.S.C.A. § 300aa–15(f)(4)(A) (West Supp.1992) (emphasis added).

■ In general, a lump-sum payment for lost earnings is calculated as the present value of the expected future stream of earnings that has been lost. *See* R. Posner, Economic Analysis of the Law 177 (3d ed. 1986). The special master found that Edgar was entitled to lost earnings of $1,649,119.51. Edgar's lump-sum payment should be sufficient to provide a future income stream equal to $1,649,119.51. The award of $127,048.00 will not provide this stream of income.

■ The Claims Court held that the special master properly awarded $127,048.00 as the net present value of lost earnings because net present value determined by either the cost of an annuity or by using a discount rate will provide a stream of payments equal to $1,649,119.51. In support of this holding, the Secretary cites several cases for the proposition that an annuity can be a proper measure of net present value. *See Reilly v. United States,* 863 F.2d 149, 170 (1st Cir.1988); *Thompson v. Camp,* 163 F.2d 396, 402–03 (6th Cir.1947); *Colusa Parrot Mining & Smelting Co. v. Monahan,* 162 F. 276, 282 (9th Cir.1908); *Baltimore & O.R.R. v. Henthorne,* 73 F. 634, 641 (6th Cir.1896); *Montellier v. United States,* 202 F.Supp. 384, 425 (E.D.N.Y. 1962). This will be true, however, only where the annuity guarantees a future income stream. *See* R. Posner, Economic Analysis of the Law 177. Contrary to the Secretary's assertion, the annuity upon which the $127,048.00 quotation was based does not guarantee an income stream equal to $1,649,119.51; that amount would be payable only if neither of the two contingencies occurred. The happening of either contingency would reduce the total payment to less than the lost earnings compensation to which Edgar is entitled. Under the quoted annuity contract, if Jamie were to die before reaching age 18, she would receive no compensation; and, if she were

to die before receiving an income stream equal to $1,649,119.51, she would receive no further payments.

■ Nonetheless, the Secretary argues that the first contingency in the quoted annuity, requiring Jamie to reach age 18 before any payments will be made, is authorized by the Vaccine Act because section 2115(a)(3)(B) only provides for "compensation after attaining the age of 18." The Secretary misinterprets this section. Section 2115(a)(3)(B) simply prescribes a factor to be applied in calculating the total compensation for lost earnings, *i.e.*, it must be presumed that an injured child will not begin working until age 18. Once lost earnings are calculated using this factor, however, nothing in section 2115(a)(3)(B) permits the compensation award to be contingent upon the child reaching age 18.

■ In addition, nothing in section 2115(a)(3)(B) authorizes the amount of compensation to be contingent upon the actual, post-injury life of the injured child. In determining compensation, this section requires consideration of only whether the injured child is "likely to suffer impaired earning capacity at age 18 and beyond." 42 U.S.C.A. § 300aa–15(a)(3)(B) (West 1991). Implicit in this consideration is a determination of the expected, not the actual, work-life of the child. In this case, the special master determined Jamie's expected work-life after reaching the age of 18 to be 28 years. Section 2115(a)(3)(B) does not make the amount of compensation contingent upon the child actually living to an age equal to 18 years plus 28 years.

■ Absent specific statutory language to the contrary, it is well settled that economic losses attributable to an injury must be measured by the victim's pre-injury life expectancy. *E.g., Sea–Land Servs., Inc. v. Gaudet,* 414 U.S. 573, 594, 94 S.Ct. 806, 819, 39 L.Ed.2d 9 (1974); Restatement (Second) of Torts § 924 cmts. d, e (1977); 25 C.J.S. *Damages* § 87(e) (1966). The cost of the annuity quoted by the Secretary is not based upon pre-injury life expectancy. Instead, because the annuity would cease paying benefits upon Jamie's death, it is based on her post-injury life expectancy.

■ The Secretary also implies that the special master properly awarded Edgar the cost of a deferred life-contingent annuity because section 2115(f)(4)(A) permits the special master to order the purchase of an annuity "on the basis of the net present value of [lost earnings]." 42 U.S.C.A. § 300aa–15(a)(3)(B) (West 1991). Again, the Secretary misinterprets the Vaccine Act. This section authorizes the special master to use part or all of the lump-sum "determined on the basis of the net present value of the elements of the compensation" including lost earnings for the purchase of an annuity. It does not permit the Secretary to substitute an amount reflecting the cost of an annuity with contingencies, which might limit payments to less than the calculated lost earnings for the lump-sum determined on the basis of present value. However, the cost of an annuity that does not have those contingencies, as we have indicated, may be the best evidence of net present value.

## CONCLUSION

We have considered the remaining arguments made by the Secretary and find them unpersuasive. For the foregoing reasons we vacate the part of the judgment that awards Edgar $127,048.00 for lost earnings and order judgment to be entered awarding Edgar $254,886.35.

## COSTS

Costs awarded to Edgar.

VACATED and REMANDED.